**UNITED STATES of America,**
v.
**Walter O. CARLSON, Defendant.**
**No. 65 CR 88.**

United States District Court
E. D. New York.
Aug. 11, 1966.

Jules Ritholz, New York City (Kostelantz & Ritholz, New York City, of counsel), for defendant.

Donald F. McCaffrey, New York City (Joseph P. Hoey, U. S. Atty. for Eastern District of New York, of counsel), for the United States.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Defendant has moved to suppress evidence obtained by the Special Agents of the Intelligence Division of the Internal Revenue Service through interviews conducted by them with defendant at which defendant was not advised that he was entitled to be represented by counsel and that the investigation was addressed to fixing upon him criminal responsibility for his understatements of income tax in the years 1957, 1958, 1959, 1960 and 1961. Defendant moved also, on the ground that it is necessarily founded upon evidence illegally obtained, to dismiss the indictment and all the counts of it.

The indictment, under Internal Revenue Code § 7206(1) charges that defendant willfully made tax returns for 1958, 1959 and 1960 which he did not believe to be true and correct in material matters; the specification is understatement of income tax liability due to the omission of dividends, capital gains, and interest.

Admittedly—now at least—defendant's income tax liability in each year was substantially understated. Defendant reported some dividends every year and in one year reported a capital gain; he did not report all his dividends, nor any of his savings bank interest, nor all his capital gains. The data available for prosecution include defendant's own statements of his dividend income derived from securities kept in his own custody, the records of Goldman Sachs & Co., Bache & Co. and Merrill, Lynch, Pierce, Fenner & Smith (and Form 1087s filed by Merrill, Lynch) copies of the savings bank pass books, and Form 1099s filed by various dividend-paying corporations. Suppression is significant only as to such evidence as the taxpayer produced against himself about his knowledge that he had the income and had not reported it and the reason for not reporting it, and as to the data, if any,

which came to the Government's hands only after the Intelligence Division began its criminal inquiry and by reason of leads obtained from defendant in the challenged interviews.

The Government, here, is transactionally interested as tax-collecting sovereign in the tax owed to it and not paid. Apart from being prosecuting sovereign the Government is interested to get the data to compute its tax for collection. As a prosecuting sovereign it is additionally interested in matter relevant only to criminal punishment or to the related but milder punishment of the fraud and negligence penalties that are collectible as additions to tax.

In this latter aspect the Government is interested in making such inquiries—irrelevant to the tax computation—as these: Were you conscious that you had omitted material items and that the tax you showed was less than the tax due? Did you intend by the conscious omission from the returns of items that you knew were taxable to evade and defeat the payment of the tax? Did you observe on the brokerage statement that you received the printed legend advising you to preserve the broker's statement for use in preparing your income tax return? Did you know that capital gains on securities are taxable even though within 18 months the proceeds are re-invested in property of substantially the same sort? The answers to such questions bear upon criminal responsibility and on liability to "civil" penalties for negligence or fraud.

 The United States as tax-imposing sovereign was entitled under Internal Revenue Code §§ 6011(a), 6012 and 6013 to have a return of tax from the defendant or from the defendant and his wife which set forth the information required by the tax form and the regulations. It is idle to suggest that the duty to file that return or to supply the information called for by the tax form and regulations was discharged by filing an incorrect return. The duty to respond correctly to the inquiries made by the form of tax return is a continuing duty.

It is not distinctively a duty of self-accusation for, considered by itself, the supplementing of a return by additional information relevant to tax computation is wholly compatible with innocence and with the absence of negligence, fraud, wilfulness and criminality.

 Internal Revenue Code §§ 7601–7606 empower the Internal Revenue Service to examine records relative to an inquiry directed to ascertain the correctness of any tax return and to summon the persons liable to the tax, and anyone having custody of books of account relating to the tax liability, and such summonses are enforceable in the District Courts. There can be no question that appropriate inquiries under Sections 7602 through 7605 are necessary governmental implementations of the duty to file the returns and to pay the taxes. The mere filing of an inadequate tax return can not discharge the responsibility to make the disclosure that will complete the return merely because to do so will supply indispensably necessary data preconditioning any governmental case for criminal responsibility. So, the present case may involve delineating the boundary between the area of responsibility for civil disclosure and the area in which, if ever, interrogation and the eliciting of evidence and evidentiary leads were material only, or only significantly, to the pursuit of criminal objectives.

A whole second range of consideration is presented in this case, because of the nature of the defendant's professional experience. If a defendant is entitled to be told—or reminded—that he has the right to the assistance of counsel, must that be done for men equally competent with the interrogating officer to remind him that the right exists? And if no broad generalization can be made based on the calling and competency of the particular taxpayer and potential defendant—for he may not be sensitive to the moment when inquiry has become oriented toward eliciting evidence for use in a criminal proceeding—does that become a factor in the context of a par-

ticular interrogation and the possibility that the taxpayer and potential defendant is calculatedly investing a mixture of self-condemning statements, exculpatory arguments and proffers of belated co-operation with the Internal Revenue Service even as the Internal Revenue Service may be skirmishing for inculpatory statements as well as pursuing objective factual data?

The final range of considerations brought to bear upon this case arises out of defendant Carlson's health.

\* \* \* \* \* \*

Two grounds of suppression are suggested: the first of these is that Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, requires suppression because defendant was not advised of his right to counsel. The second reason is that there was a transgression of defendant's rights because the admissions were the product of his mental disturbance at the time.

█ To deal with the last question first: The evidence of the two psychiatrists, who dealt with the defendant's situation with sympathy and insight, does not nearly suggest that the defendant was by reason of his health unable either when they saw him, or at the period considerably earlier when he was going through his interviews with the government, to take care of himself in the tax interviews. Dr. Wadsworth found what he construed to be definite evidence of a deteriorative brain damage very likely arteriosclerotic in its general nature. He found this manifested in the defendant's diminished visual motor coordination, his problems of gait, his inability to continue well-formed handwriting through the whole of passages of modest length, and the cumulative impression of a deteriorating personality indicated in impairment of ethical judgment and diminution in mental efficiency. Dr. Wadsworth could not back-date his observations of November 1, 1964, to any definite earlier period. His conclusion was not final and was not an opinion that defendant's was a weak

spirit or will or mind. On review in 1966 he could not say that the aggregate data available to him enabled him to either confirm or rule out an impression of diffuse brain damage and cerebral arteriosclerosis. While he took very much into account a systematic and properly administered psychological test which indicated some impairment of thinking, Dr. Wadsworth pointed out that the test showed superior intelligence in some areas of test, and he noted the preservation—not unexpectedly—of superior mathematical acuity.

Dr. Wadsworth pointed out that a man having such symptoms as the defendant exhibited was capable of holding down a good job, a job that involved responsibility—on the assumption, and the Doctor was firm in finding no evidence of malingering, that all of the symptoms reported to him were genuine.

Dr. Lehrman, too, did not depict defendant as a person unequal to the occasions of his life. He insisted that the complex of health problems that defendant had faced over the years could well be consistent with the production of such a depression as could impair judgment. He noted that being told that one was subject to a catastrophic illness could cause impairment of judgment in other life activities conducted in the same period, and that emotional disorders traceable to a protracted episode of that kind could both accelerate organic deteriorations and, perhaps, precipitate latent ones into an active form, and so bring about impaired judgment. But, the doctor's ultimate conclusion that there was nothing inconsistent between the defendant's record of business achievement and his mental condition again underlines that neither doctor was saying the defendant was inadequate to trying situations. They were saying he was not mentally a wholly well man, although he was competent to conduct the business of life.

Both doctors said that defendant could have masked his twitch and the nodding of his head so that it was not observed by the Internal Revenue Service personnel.

**427**

All of the Service witnesses testified that they had not observed any spasmodic twitching or tic. Both doctors indicated that such a tic, although in general continuous, is not incessant, and is not incapable of being masked, or, for some periods of time, controlled.

Neither doctor had read the text of the meetings between the defendant and the Intelligence Division but neither thought the text would throw light on whether the defendant was on those occasions evincing a morbid mental condition. Dr. Lehrman pointed out that without the total atmosphere of the occasion the words themselves would not communicate a great deal nor would they indicate what the interplay of pressures in the meeting was.

The testimony about defendant's illness and mental condition contributes no evidence that his mind was over-mastered, or that his disclosures were to any extent the product of anything except his own healthy volition.

 Whether or not the *Miranda* case and similar cases are treated as limited to the case of a person in a custody that is inescapable as a practical matter, and granting that in the typical *Miranda*-type case there can be no silent or unexpressed waiver of the right to counsel, the case still has no application here. The present case presents the perhaps equally difficult question of when it is that evidence has been so unfairly taken that its use against the defendant will be suppressed. *Bolich v. Rubel*, 2d Cir. 1933, 67 F.2d 894, 895, may oversimplify in suggesting that, while a taxpayer may file no return at all and then stand on his privilege against self-incrimination in refusing to produce any evidence against himself, he nevertheless subjects himself to limitless scrutiny if he does file a return, and that no constitutional difficulty arises until an abuse appears. And while the *Miranda* case deals with the extreme position of the man in custody, from which an implicit inference of a want of true volition is so powerful that the interrogating

government is required to show clearly that the interrogation proceeded only after certain sternly formal procedures were complied with, every other case of interrogation by a government presents, if in diluted form, an underlying inequality of confrontation that may be supposed to require the government to show the answers that it has in its possession were derived from a genuinely free volition. Whether a person is in custody or not, he is entitled to the assistance of counsel if he is facing an explicit or imminent criminal charge. It is logically difficult to determine whether anything more is necessary to ripen the rights to the assistance of counsel and to a warning to that effect than the mere fact that the government is the interrogator and is conducting the interrogation in the perspective of criminal law enforcement, whether or not it has already resolved to go forward. The tax cases do not indicate that the standard is the standard applicable to protect persons in custody. United States v. Silverstein, 2d Cir. 1963, 314 F.2d 789, 790, treats an appearance before a special agent of the Intelligence Division as in the nature of an appearance in a criminal investigation, and it says that a claim of privilege against a summons directing production of individual papers would be sustained in that context. Russo v. United States, 2d Cir. 1957, 241 F.2d 285, 287, may assume, though without comment, the inadmissibility of disclosures obtained by Treasury Agents by means of deceiving a taxpayer into thinking an examination was for the purpose of a routine civil audit rather than for the purpose of a criminal charge. In United States v. Sclafani, 2d Cir. 1959, 265 F.2d 408, 414–415, defendant sought to exclude data from evidence on the ground that it was turned over after the case had been transferred to the Intelligence Division without the taxpayer's having been advised that the case had ceased to be a routine audit and had become a criminal investigation. The Court rejected the contention essentially on the ground that the defendant was entitled to no more in the context

than freedom from deceit and that the change in the coloration of the investigation, if it had occurred, did not vitiate the defendant's consent to the production of the data.

In re Turner, 2d Cir. 1962, 309 F.2d 69, was an appeal from an order denying a motion to quash a summons issued under Section 7602(2) of the 1954 Code. The taxpayer had been commanded to produce all of his records covering designated tax years. The taxpayer argued that the Special Agent was embarked upon an investigation directed to instituting a criminal proceeding and that in consequence the taxpayer was protected against appearing and producing his papers by his Constitutional right not to incriminate himself. The District Court denied relief on the ground that the taxpayer could assert his Constitutional rights when he appeared before the Special Agent. The Court of Appeals affirmed, said that any tax investigation involved a theoretical possibility of disclosures that might lead to a criminal indictment, and that no special class of investigations, such as those initiated by Special Agents of the Intelligence Division, could be treated as exclusively directed to the initiation of criminal cases. The taxpayer, like any other witness, must obey the summons and claim his Constitutional privileges as particular questions are asked which accrue the right to assert the objection. As to the production of self-incriminating records, the Court said that not only was it unclear that defendant and his counsel might not decide to produce the records, but also it was not yet evident that production of every item in the defendant's records must be dangerous because it might result in injurious disclosure.

The cases assume that interrogation is relatively free as between government and taxpayer until some ill-defined zone is reached in which fairness requires the government to alert the defendant that the theoretical risk of a criminal prosecution implicit in any investigation of an imperfect return has become a matter of pointed interest on the part of the government, whether or not the government has resolved to proceed. At some point the Government's further questions may become an attempt to take testimony in aid of prosecution rather than as part of an investigation.

In Kohatsu v. United States, 9th Cir. 1965, 351 F.2d 898, cert. den. June 20, 1966, 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (Mr. Justice Douglas voting to grant and to affirm) no warning with respect to Constitutional rights had been given. The Court considered that the rule of Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977, did not reach a case in which the defendant had neither been arrested nor indicted. The Court rejected the suggestion that the *Escobedo* case should be extended to a case in which all the statements were made and the documents delivered voluntarily and not under the inducement of stealth, trickery or misrepresentation. The Court relied on United States v. Sclafani, supra. In the *Kohatsu* case (351 F.2d at 900) the defendant conceded that an Internal Revenue Agent had the right to determine a taxpayer's correct civil liability and in so doing to interrogate the taxpayer and examine his books and records. The defendant argued only that such a "routine civil tax investigation" changes when a revenue agent discovers facts indicating substantial unreported income and the facts are such that the revenue agent suspects fraud.

■ In the present case defendant's disclosures were not the product of any sort of fraud, misconduct or misleading on the part of the revenue agents. Defendant had plainly moved into the zone of criminal investigation, and he knew it. His first answer to the first formal interrogation expressed his understanding that the nature of the proceeding had changed. Special Agent Alleva's warning at the beginning did not separate out clearly the two ideas that statements did not have to be made and that if made they could be used against the taxpayer, but the reference to the Fifth Amendment and the compacted statement that

the defendant did not have to make any statements that he felt might incriminate him under federal law expressed the full menace of the choice defendant was making in submitting to interrogation.

It may well be the fact that of fifty investigations in which Special Agent Alleva has been involved in the five years since he has done this work only seven proceeded beyond the preliminary stage, that only four resulted in indictments or informations and that of the remaining three one resulted in the recommendation that there be no prosecution and two are still open, and it may well be that the attitude of mind of Special Agents in the Intelligence Division is rather that they seek to determine whether there should be prosecution rather than to unearth evidence to support a desired prosecution. But transfer of a case to the Intelligence Division is formal administrative action genuinely signifying official orientation of the investigation toward data relevant to criminality rather than to tax liability as such. Hence the question is simply whether in such a preliminary but definitively criminal investigation as the present one something more than the warnings given was necessary. It is concluded that no more was needed in the circumstances of an investigation conducted by the Intelligence Division in the manner and circumstances of the present investigation.

In the present investigation the defendant had ample time to consider, before he appeared voluntarily at the Intelligence Division office, whether to consult with counsel and to be accompanied by counsel. The interrogation was not reassuring to the defendant. It was straightforward and its thrust most evident. In the first interrogation the special agent proceeded systematically to elicit the depth of the defendant's education, the nature of his work, his bank accounts, his brokerage accounts, his savings accounts (which were then for the first time itemized), the source of the funds in the savings accounts, the extent of defendant's ownership of stocks (both directly and through brokerage accounts), the collateral position of certain of the securities, the places of deposit of dividends and interest, the status of a collateral loan, the capital gains transactions, the real estate transactions and holdings, and the source of the funds used for the real estate transactions. Then the Special Agent examined about the preparation of each of the three returns, and about defendant's consciousness of the omissions from the returns and his explanation of and excuses for the omissions. There is no doubt that many of the statements made are highly incriminating. It was very evidence to the defendant that the questions called for incriminating answers, and they were freely given, the defendant distinguishing between the instances, such as the omission of capital gains, where he considered that he had a satisfactory explanation, and those in which he presented only an excuse for having filed returns which did not include income items which he said he knew were taxable.

Similarly in the case of the September 25 interrogation: defendant was first warned of his Fifth Amendment rights, and the questions related to defendant's possessing a Treasury Department card until 1962, to the explanation of the omission of dividend and interest income, to the details of the excuse of the unavailability of records needed to make a complete return, to the kind of accounting work that defendant had done and his participation in preparing corporate income tax returns, and to the cost basis of certain stock.

The government's inquiries could not induce in defendant a belief that criminal proceedings were not contemplated as possible. Defendant's motivations in participating as he did in the inquiry are not brought out by the evidence, since defendant did not testify. The most profound of lawyers might well have advised defendant that just such was the wisest course for him to pursue in view of the completeness of the data already at the

Government's command. There is, in any event, no evidence of any over-reaching on the Government's part.

Accordingly on defendant's motion to suppress and to dismiss the indictment, it is

Ordered that the motion is in all respects denied.